Argued and submitted September 4, 1992, resubmitted In Banc April 8, affirmed on
appeal and on cross-appeal June 23, appellant's motion for reconsideration filed
July 28 allowed by opinion November 17, 1993
See 124 Or App 615 (1993)

# STATE OF OREGON,
*Appellant - Cross-Respondent,*

*v.*

# JAMES R. WEAVER,
*Respondent - Cross-Appellant.*

## (C9103-31294; CA A71768)

854 P2d 962

Brenda J. Peterson, Assistant Attorney General, Salem, argued the cause for appellant - cross-respondent. With her on the briefs were Charles S. Crookham, Attorney General, Virginia L. Linder, Solicitor General, and Mary H. Williams, Assistant Attorney General, Salem.

John S. Ransom, Portland, argued the cause for respondent - cross-appellant. With him on the brief were James D. Lang and Ransom, Blackman & Weil, Portland.

De MUNIZ, J.

Edmonds, J., dissenting.

**De MUNIZ, J.**

Defendant owns a secondhand store that sells guns. He was indicted on 52 counts of failing to register the transfer of handguns and on 249 counts of failing to register the transfer of used firearms. ORS 166.420; ORS 166.427. The state appeals an order granting defendant's motion to suppress evidence that was seized during a warrantless search of his store. ORS 138.060(3). We affirm.

We take the facts from the trial court's findings that are supported by the evidence and the evidence that is consistent with those findings. *State v. Davis*, 313 Or 246, 250, 834 P2d 1008 (1992); *State v. Huckaba*, 115 Or App 728, 730, 839 P2d 768, *rev den* 315 Or 272 (1992).

On October 19, 1990, Multnomah County sheriff's deputies and Portland police officers, armed with a warrant, searched defendant's store. They were looking for stolen property that had been sold to the store by a known burglar. During that search, Deputy Hutchison asked Sergeant Merrill to demonstrate how to check for compliance with an ordinance that regulates record keeping by secondhand dealers. The ordinance requires the dealer, when purchasing regulated property, to record the identity of the seller and a description of the property on a form called a secondhand dealer report.[1] Multnomah County Code § 6.81.080. The ordinance also requires the dealer to keep regulated items in the store for 15 days after purchasing them. Multnomah County Code § 6.81.090.

With defendant's cooperation, Hutchison and Merrill examined 31 secondhand dealer reports. The officers found irregularities on eight of the reports and seized them.[2]

Hutchison decided to do a more extensive "compliance check." He returned to defendant's store on November 28, 1990, with 12 or 13 officers. According to Hutchison, they arrived around noon. Defendant was not at the store, but the manager, Laudum, was there. The officers began conducting the compliance check. They soon discovered that the firearms

---

[1] The form is also referred to as a PS51.

[2] The court denied defendant's motion to suppress those reports. That ruling is not before us.

transfer forms required by ORS 166.427 were not in the store. Hutchison then asked Laudum for permission to search the store, and Laudum said that Hutchison would have to ask defendant.

Hutchison spoke with defendant on the telephone. Defendant asked Hutchison to come and speak to him in person at the fire station where he was working. Hutchison and Sergeant Beamer went to the fire station and asked defendant if they could search his store. Defendant called his attorney, Alterman, and spoke with him while the officers waited. Alterman then spoke with Hutchison and negotiated an amendment to a written consent form. Alterman then advised defendant to sign the form. A notation on the form indicates that defendant signed it at 2:00 p.m.

Merrill testified and explained how the search was conducted. A deputy took the Acquisition Disposition Register (ADR), a federally required record, to the sheriff's office, made photocopies of it and brought them back. The officers checked the brands and serial numbers of the guns that were in the store. Then, they checked the ADR to ascertain the secondhand dealer report number for each gun and asked the employees for each report. Most of the reports were not available, and some reports did not match the guns listed on the ADR. The officers seized most of the guns in the store. Merrill testified that the officers began examining the ADR, the guns and the secondhand dealer reports 30 to 45 minutes after arriving at the store.

Detective Howe testified about the property receipts that were filled out while the guns were being seized. He said that he put an identification tag on each gun while another officer entered a description of the gun and the tag number on the property receipt. After the officer entered the information about a gun in the property receipt, another officer removed the gun to the property truck. Two of the three property receipts listed 12:15 p.m. as the "occurrence" time and the third receipt did not list any occurrence time. Howe examined one of the receipts and identified it. He said that the 12:15 time might not be accurate, but he indicated that he probably started tagging the guns by 1:00 p.m.

The trial court granted defendant's motion to suppress all of the evidence seized during the November 28 search on two grounds. First, the court found that the officers began searching for evidence and seizing it before Hutchison obtained defendant's consent. Second, the court concluded that the seizure of the ADR and the guns exceeded the scope of the consent that defendant had granted, because defendant had not consented to the seizure of evidence of record keeping violations.[3]

■ The state contends that there is no evidence to support the court's finding that the officers began their search before Hutchison obtained defendant's consent. The state is wrong. Hutchison and Merrill testified that the officers arrived at defendant's store around noon. Merrill's and Howe's testimony indicates that the seizure of evidence began no later than 1:00 p.m. The consent form indicates that defendant purportedly consented at 2:00 p.m. The evidence supports a finding that the officers began searching for and seizing evidence well before defendant signed the consent form. The officers invaded defendant's constitutionally protected privacy interests when they began searching and seizing evidence without a warrant, without consent and without any other exception to the warrant requirements of Article I, section 9, and the Fourth Amendment. The fact that defendant subsequently consented does not vitiate the unlawfulness of a search and seizure that violated the state and federal constitutions at its inception.[4]

---

[3] The court found that defendant consented to the seizure only of stolen property.

[4] The dissent's presentation of this case as a fairy tale is indeed entertaining, but it relies on a phenomenon that can happen only in fairy tales — time travel. The dissent apparently concedes that the record supports the trial court's finding that the officers began searching and seizing before Hutchinson obtained defendant's consent. When the "queen's soldiers" (the police) began searching Weaver's pawn shop and seizing evidence, they had no exception to the warrant requirement.

Hutchinson obtained defendant's consent at 2:00 p.m. The dissent contends:

"A knowing consent made subsequent to the inception of the search and seizure could relate back to the beginning of the search and act as a waiver of defendant's section 9 rights regarding the privacy interests that were invaded before the consent form was signed." 121 Or App at 372.

The dissent concedes that from 12:30 to 2:00 p.m., the "queen's soldiers" were unreasonably searching and seizing. The dissent asserts: "The moral of this fable is that 'reasonable' really means 'unreasonable.' " 121 Or App at 371. That assertion could only be correct if we accept the dissent's proposition that the magic wand of

■ The state contends that the court abused its discretion by refusing to allow the state to present additional evidence to clarify when the search began. To preserve that alleged error, the state was required to make an offer of proof on what evidence it would have presented. *State v. Busby*, 315 Or 292, 298, 844 P2d 897 (1993). The state did not make an offer of proof, nor did it attempt to do so. *Compare State v. Rodriguez*, 115 Or App 281, 840 P2d 711 (1992) (reversible error when the defendant had a right to make an offer of proof and the court refused to allow him to make the offer). The state has waived any objection it may have had to the court's decision to not allow the state to reopen the evidentiary phase of the hearing.

■ It is possible that some of the searching and seizing occurred after defendant consented. However, nothing in the record suggests which items were seized after 2:00 p.m., nor does the record indicate which evidence was seized without the benefit of information contained in the ADR.[5] *If* any of the evidence was lawfully seized, the state has not met its burden of proving it.

Because the state did not prove that the search for and seizure of evidence followed defendant's consent, we need not decide whether the seizure exceeded the scope of defendant's consent.

In a separate motion, defendant moved to suppress the ADR on the ground that federal law forbade the officers from asking defendant for permission to examine it. The court denied that motion. That ruling is the subject of defendant's cross-appeal. We need not address separately the

---

voluntary consent transported the defendant and the "queen's soldiers" back in time so that the consent preceded the concededly unreasonable search and seizure.

But this is not Wonderland; "unreasonable" still means "unreasonable," and neither we nor Officer Hutchinson can travel back in time to alter the past. Even if we could, the record would not support a finding that defendant consented to a search that was already in progress. The state admits that defendant did not know about the ongoing search when he signed the consent form. He could not possibly have ratified the unreasonable and unconstitutional search and seizure, and the state failed to prove that any evidence was seized after defendant consented.

[5] Evidence seized because of information contained in the ADR would require suppression, unless the state proved that it would have been discovered independently by lawful means. ORS 133.683.

issues raised in his cross-appeal, because the court correctly granted his motion to suppress all of the evidence that was seized on November 28. The cross-appeal is moot.

Affirmed on appeal and on cross-appeal.

**EDMONDS, J.,** dissenting.

Once upon a time, there lived in a far away land some people called "Oregonians." Because these people had traveled a long way to start a new life in the wilderness, they desired to adopt laws that would protect their privacy and possessory interests from government tyranny. To that end, they adopted a law called "Section 9." It said:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable search, or seizure*; * * *." (Emphasis supplied.)[1]

The people also said that if a person consented to a search of a place in which he had a privacy or property interest, then the search was "reasonable," because that person had given up those interests with respect to that entry.[2] After all, Oregonians were an intelligent and independent people who were capable of making up their own minds about whether to waive the protection of section 9. For many years, the people lived happily under the protection of section 9. Although there were occasional disputes about the meaning of section 9, no one doubted that a search by "consent" was a "reasonable search."

In a village in the kingdom, there lived a man by the name of Weaver who sold used items to Oregonians. One day, the queen's soldiers wished to investigate as to whether Weaver was obeying a law[3] that required him to keep certain

---

[1] Article I, section 9, protects privacy and possessory interests from unlawful searches and seizures. A "search" occurs when a person's privacy interests are invaded. An invasion of a "privacy" interest in property occurs when there is a significant unconsented-to interference with a person's possessory or ownership interests in property. *State v. Owens*, 302 Or 196, 206-07, 729 P2d 524 (1986).

[2] In *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992), the court said that a warrantless search by police based on a consent to search is "reasonable" under section 9.

[3] Multnomah County Ordinance No. 647 authorizes police to enter second hand stores to determine whether compliance with record keeping requirements regarding the purchase and/or sale of regulated items, *i.e.*, firearms, jewelry, electronic equipment, or other property that is frequently the subject of theft, is occurring.

records regarding his sales. They went to his store but he was not there. However, in checking the records, they found that there were no transfer forms for used firearms.[4] They asked the store manager if they could search the premises, believing that they might find firearms for which no transfer forms existed. The store manager telephoned Weaver and one of the soldiers, Hutchinson, explained to Weaver what they wanted to do. Weaver asked Hutchinson to meet with him to discuss the matter. Hutchinson went to where Weaver was working and again explained what the queen's soldiers wanted to do. He requested that Weaver consent to a search of the store. Weaver telephoned his lawyer and had a conversation with him while Hutchinson waited outside. Then, Weaver asked Hutchinson to speak with his attorney and Hutchinson explained about the ordinance, the lack of transfer forms, and about the search that they wanted to conduct. He told the lawyer that he was willing to obtain a search warrant or Weaver could consent to the search.

Weaver and his attorney had another private discussion, and then, Weaver asked Hutchinson to speak with Weaver's attorney for a second time. Hutchinson and the attorney negotiated an amendment to the written form of consent that Hutchinson had with him. Weaver and his attorney had another private conversation and then Weaver signed the consent form as amended by the discussion between Hutchinson and the attorney. The consent form read:

"CONSTITUTIONAL RIGHTS WARNING: SEARCH BY CONSENT BEFORE ANY SEARCH IS MADE, YOU MUST UNDERSTAND YOUR RIGHTS

"(1) You may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of the premises described below.

"(2) If you consent to a search, anything of value as evidence seized in the course of the search can be used in court against you.

---

[4] ORS 166.427 requires that a person engaged in the business of selling, leasing or otherwise transferring a firearm shall enter in a register the time, date and place of purchase or trade, the name of the person selling or trading the firearm, and identification numbers of the firearm.

"I HEREBY CONSENT TO A SEARCH WITHOUT WARRANT OF THE FOLLOWING (DESCRIBE PREMISES, AUTO OR OTHER SUBJECT OF SEARCH): **ENTIRE PREMISE OF ABE'S SECONDHAND STORE. FOR: ALL USED FIREARMS AND CORRESPONDING PAPER RECORDS, ONLY THOSE JEWELRY ITEMS + PAPER WORK WITH COMPLIANCE IRREGULARITIES, AND ONLY THOSE OTHER ITEMS OF REGULATED PROPERTY + PAPER RECORDS WITH COMPLIANCE IRREGULARITIES. BY DEPUTIES OF THE DIVISION OF PUBLIC SAFETY, MULTNOMAH COUNTY, OREGON.**

"I HEREBY AUTHORIZE THESE OFFICERS TO SEIZE ANY ARTICLE WHICH THEY CONSIDER TO BE OF VALUE AS EVIDENCE.

"THIS STATEMENT IS SIGNED OF MY OWN FREE WILL WITHOUT ANY THREATS OR PROMISES HAVING BEEN MADE TO ME." (Bold portion reflects the handwritten modifications to the form made at the request of Weaver's attorney.)

After Weaver signed the consent, Hutchinson returned to the store, completed the compliance check, and seized a large number of firearms. As a result of the seizure, the queen's soldiers charged Weaver with multiple crimes of failure to register the transfer of a handgun under ORS 166.410 and failure to register the transfer of a used firearm under ORS 166.427. Weaver asked for a trial before the queen's magistrate. Before the trial, Weaver told the magistrate that his rights to privacy under section 9 had been violated by the soldiers when they searched his store and seized the firearms and the records. The magistrate found that Weaver's consent was voluntary and not the result of any fraud, trickery or coerciveness but he said the firearms and the records could not be used in the trial. He held that the consent authorized a search but did not authorize the soldiers to seize any items "that would evidence a compliance irregularity."[5] As an alternative basis for his ruling, he held that because the consent was executed at 2 p.m. and the soldiers

---

[5] The consent form expressly authorizes the seizure of "any article which [the officers] consider to be of value as evidence." Defendant and his lawyer should be held to an objective standard regarding the meaning of the language in the consent form. *See State v. Ainsworth*, 310 Or 613, 621 n 9, 801 P2d 749 (1990).

went into the store at approximately 12:30 p.m., the search was unlawful.

The queen was very unhappy because this meant that there could be no trial to determine if Weaver had violated the laws of the kingdom. She asked the intermediate high court to review the magistrate's decision. According to the chronicle of the intermediate high court, the court heard the queen's arguments and agreed with the magistrate's alternative ruling. It concluded, "[t]he fact that defendant subsequently consented does not vitiate the unlawfulness of a search and seizure that violated the state and federal constitutions at its inception." 121 Or App at 366.

So far as we know, Weaver lived happily ever after, and the prohibition against "unreasonable searches and seizures" in section 9 had new meaning under the court's ruling. Thereafter, all the people in the kingdom knew: once an unauthorized search begins, it can never be consented to, even if the person whose privacy interests were being invaded agrees to the search and seizure after being advised to do so by his attorney. The moral of this fable is that "reasonable" really means "unreasonable," and that even if one consents to a search by signing a consent form that one's lawyer helps write, the form still doesn't mean what it says.

This moral parallels the logic of a famous nursery rhyme character:

" 'When I use a word,' Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean — neither more or less.'

" 'The question is,' said Alice, 'whether you *can* make words mean so many different things.'

" 'The question is,' said Humpty Dumpty, 'which is to be master — that's all.' " Lewis Carroll, *Through the Looking-Glass* ch 6 (1872).

To summarize: when the search began, it was unauthorized. The trial court and the majority say that that fact ends the inquiry. They err because they fail to consider whether the search and seizure that occurred before the consent was signed fall within the purview of the consent. So far as I can tell from the record, defendant and his attorney

were aware of all the necessary facts[6] and made an informed decision to consent to the search and the seizure. In fact, they delineated what could be searched. A knowing consent made subsequent to the inception of the search and seizure could relate back to the beginning of the search and act as a waiver of defendant's section 9 rights regarding the privacy interests that were invaded before the consent form was signed. We should remand for the trial court to make that determination.

I dissent.

Richardson, C. J., and Deits and Riggs, JJ., join in this dissent.

---

[6] The majority says that defendant and his attorney didn't know that the search had commenced when they modified the consent form and defendant signed it. So long as the search did not exceed the scope of the consent, that fact should make no difference in the analysis.