142 F.3d 447
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
James R. WEAVER, in his capacity as sole proprietor of Abe's
Shop, Plaintiff-Appellee,
v.
Multnomah County; Patrick Nelson, individually and in his
capacity as an officer for the Portland Police
Bureau, Defendants-Appellants.
 No. 96-35055.
DC No. CV-91-00447-DCA.
 United States Court of Appeals,
Ninth Circuit.
 .
Argued and Submitted May 7, 1997.
Decided April 14, 1998.
 
 Appeal from the United States District Court for the District of Oregon Donald C. Ashmanskas, District Judge, Presiding.
 Before BOOCHEVER, BRUNETTI, and KOZINSKI, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Multnomah County, Oregon, and Portland Police Lieutenant Patrick Nelson, appeal from the district court's judgment for James R. Weaver in his case under 42 U.S.C. § 1983. Weaver, the owner of a secondhand store, alleged that the County sheriff's office and local police violated his due process and Fourth Amendment rights in connection with a search and seizure of property from the premises. We affirm in part and reverse in part, and remand for a determination of attorney fees.
 
 FACTS
 
 3
 James R. Weaver, a Portland fireman, owned Abe's Shop, a pawnshop or secondhand store, in an unincorporated area of Multnomah County, Oregon (the "County"). When Weaver purchased property such as guns, jewelry, or audio equipment for resale, Multnomah County Code §§ 6.81.080-090 required Weaver to fill out purchase report forms and to submit the forms to the County sheriff's office. The information on the forms, including a description of the property, was to be used to help the police investigate the theft of property. Id. at § 6.81.080(B)(3). The ordinances also required that secondhand dealers retain the purchased property for at least fifteen days before resale. Id. at § 6.81.090. The dealer was required to tag the property with its purchase report form number. Id. at § 6.81.100. Section 6.81.110 also provided:
 
 
 4
 Inspection of property and records.
 
 
 5
 Upon presentation of official identification, the Multnomah County Sheriff's Office ... may enter onto the business premises of any person with an occasional secondhand dealer or secondhand dealer permit to ensure compliance with the provisions of Chapter 6.81. The inspection shall be for the limited purpose of inspecting any regulated property purchased by the dealer, held by the dealer pursuant to Section 6.81.090, or the records incident thereto. Any such inspection shall only be authorized to occur during normal business hours.
 
 
 6
 Deputies Robert Zion and Karl Hutchison of the Multnomah County Sheriff's Office periodically reviewed the purchase report forms from Abe's Shop. If the deputies matched a report form with an item on the sheriff's stolen property list, they would take the property from Abe's Shop, leave a receipt, and put the property in a property control room until the person claiming ownership picked it up. Between September 1989 and January 1991, Deputy Zion made 35 visits to Abe's Shop and removed 64 items of property. None of the items taken was the subject of any court order or proceeding. None of the property was ever the subject of a hearing to determine its ownership, and none of the property was ever returned to Abe's Shop. At Abe's Shop and other secondhand stores in the County, the property was taken without warrant, notice, hearing, or reimbursement.
 
 
 7
 Weaver complained that under Oregon law he was entitled to reimbursement or at least a court order before property was taken. Deputy Zion's supervisor, Sergeant Russell Boehmer, contacted County counsel, who advised him that the statutes Weaver cited, Or.Rev.Stat. §§ 142.010 and 142.020, did not require notice or reimbursement.
 
 
 8
 In October 1990, Portland police executed a search warrant at Abe's Shop to look for stolen property. Deputies Zion and Hutchison and Sergeant Boehmer also attended the search. The officers did a brief compliance check to determine whether Abe's Shop was complying with the reporting regulations of the County ordinance. They found that about one-fourth of the purchase report forms they checked were improperly completed.
 
 
 9
 After the October search, officers from several law enforcement agencies met and planned a more extensive compliance check, to be executed with a warrant. A memo from the meeting by Portland Police Lieutenant Patrick Nelson indicated that "Research will be done to determine the legality of inspecting federal as well as state firearms records and/or seizing the firearms and business records to allow us to research them at a later time." Lieutenant Nelson called the local and San Francisco offices of the federal Bureau of Alcohol, Tobacco, and Firearms ("BATF"), asking agents whether he could view the federal firearms records, including the Acquisition and Disposition Record ("ADR log"). He stated that he was told that he could look at or copy an ADR log unless it belonged to a private collector.
 
 
 10
 At noon on November 28, 1990, a dozen officers from a variety of agencies, including the County sheriff's deputies and Lieutenant Nelson, entered Abe's Shop. They did not have a search warrant, because a district attorney had told Deputy Hutchinson there was not enough specific information to support probable cause for a warrant. The officers informed the manager, Robert Ladum, that they wanted to do a compliance check under the County ordinance, and Ladum agreed. The officers proceeded to check the County purchase report forms against the merchandise in the store. When the officers found a number of violations of the County reporting requirements, they asked Ladum to consent to a full-scale search of the shop. He referred the officers to Weaver, who was at work at the Portland fire station.
 
 
 11
 The officers telephoned Weaver, and then Deputy Hutchinson and Sergeant Boehmer left to talk to him at the fire station. Lieutenant Nelson and another officer remained at Abe's Shop, and began the compliance check on firearms, trying to match the purchase report forms to the firearms in the store. To assist the officers in locating the weapons, Ladum began using the ADR log, which was stored on a shelf behind the counter. As the compliance check proceeded, Ladum placed the log on the counter, turned it around, and allowed the officers to review it themselves.
 
 
 12
 Meanwhile, when Deputy Hutchinson and Sergeant Boehmer arrived at the firehouse, Weaver called his lawyer, who talked to the officers and then made suggestions to narrow the search. The revised consent form provided
 
 
 13
 I HEREBY CONSENT TO A SEARCH WITHOUT A WARRANT OF THE FOLLOWING (DESCRIBE PREMISES, AUTO OR OTHER SUBJECT OF SEARCH): ENTIRE PREMISES OF ABE'S SECONDHAND STORE. FOR: ALL USED FIREARMS AND CORRESPONDING PAPER RECORDS; ONLY THOSE JEWELRY ITEMS AND PAPERWORK WITH COMPLIANCE IRREGULARITIES, AND ONLY THOSE OTHER ITEMS OF REGULATED PROPERTY & PAPER RECORDS WITH COMPLIANCE IRREGULARITIES. BY DEPUTIES OF THE DIVISION OF PUBLIC SAFETY, MULTNOMAH COUNTY, OREGON.
 
 
 14
 Weaver signed the form at 2 p.m., after the search at Abe's Shop was underway. The officers called Abe's Shop to report that consent had been granted, and then returned to the shop to participate in the search.
 
 
 15
 At some point during the search, Lieutenant Nelson removed the ADR from the premises, photocopied a portion of it, and then returned the ADR to Abe's Shop. The officers continued to use the ADR log to help them check the firearms in the store against the purchase report forms. An hour or two later, the officers removed the ADR log again, and photocopied it in its entirety. The officers eventually seized more than three hundred firearms, some of which had been reported stolen, and some as evidence of reporting violations.
 
 
 16
 As a result of the search and seizure, Weaver was indicted on 52 counts of failing to register the transfer of handguns and on 249 counts of failing to register the transfer of used firearms under Oregon state reporting requirements. A warrant was issued for his arrest on these charges.
 
 
 17
 At Weaver's arraignment, he was released on his own recognizance and ordered to turn himself in for booking the next day, Saturday, April 6, 1991. Weaver's arrest warrant was recalled by the state court. When he arrived at the Multnomah County Justice Center at 8:45 a.m. on April 6, however, the County corrections computer system showed his warrant as outstanding. Weaver was taken into custody and detained for eight hours while the error was detected. He was released around 6 p.m.
 
 
 18
 At his trial on the state registration charges, Weaver filed a motion to suppress all the evidence seized in the November 28 search. The state court granted the motion, finding that Weaver had consented only to a search for stolen property, and that at any rate Weaver did not give his consent until 2 p.m. so that any search or seizure before that time was illegal. The Oregon Court of Appeals and the Oregon Supreme Court affirmed. State v. Weaver, 319 Or. 212, 874 P.2d 1322 (Or.1994); State v. Weaver, 121 Or.App. 362, 854 P.2d 962, adhered to on reconsideration, 124 Or.App. 615, 863 P.2d 1273 (Or.Ct.App.1993).
 
 PROCEDURE
 
 19
 Weaver filed this action in federal district court alleging constutional violations under 42 U.S.C. § 1983, and naming as defendants Multnomah County and Portland Police Officer Lieutenant Patrick Nelson. Weaver also named other officers and the city of Portland; the claims related to those defendants were dismissed or denied, and are not before us.
 
 
 20
 The complaint alleged that the defendants violated Weaver's Fourth Amendment and due process rights by returning property to its claimed owners without notice and a hearing, by seizing the ADR log and Weaver's property, and by unlawfully imprisoning Weaver. In the answer, Lieutenant Nelson claimed qualified immunity. The parties filed cross-motions for summary judgment.
 
 
 21
 The district court granted Weaver partial summary judgment, finding as a matter of law that the return of seized property to the alleged owner without notice or a hearing violated Weaver's due process rights. The court also held that Weaver's consent to the search of the secondhand property was not necessary, because the County secondhand property ordinance authorized the sheriff to inspect secondhand stores and any regulated property. Nevertheless, the court held that the ordinance did not authorize seizure of the ADR log, and the plain view doctrine did not justify its seizure. Issues of fact remained regarding the scope of the consent to search, and Weaver's false imprisonment claim.
 
 
 22
 The jury returned a verdict on Weaver's remaining claims on November 9, 1995, awarding Weaver $54,504.48 in damages for the return of seized property to claimed owners without notice or hearing. The jury found that Deputy Hutchinson and Multnomah County did not violate Weaver's constitutional rights during the November 28 search. Based on the district court's ruling that Lieutenant Nelson's removal of the ADR log from Abe's Shop violated Weaver's Fourth Amendment rights, the jury awarded $35,000 in damages against Lieutenant Nelson. Finally, the jury found that Multnomah County deprived Weaver of his liberty through deliberate indifference to his constitutional rights when it mistakenly imprisoned him on the recalled warrant, and awarded Weaver nominal damages of $1.00.
 
 
 23
 The district court later reduced the award for the return of seized property to its claimed owners to $2,675, the amount Weaver paid to acquire the items. The court also denied Lieutenant Nelson's post-trial motion for qualified immunity.
 
 
 24
 Weaver moved for an award of attorney fees under 42 U.S.C. § 1988, and the district court awarded him $75,731.25 for legal work on the successful claims.
 
 DISCUSSION
 I. DUE PROCESS
 A. Policy or Practice
 
 25
 The district court held that the County violated due process by depriving Weaver of his property interest without notice and a hearing. The County appeals that holding, arguing that it adopted no County policy, express or de facto, regarding the seizure of secondhand property and its return to those claiming ownership without notice or a hearing.
 
 
 26
 "A local government entity cannot be held liable under § 1983 unless the plaintiff alleges 'that the action inflicting injury flowed from either an explicitly adopted or a tacitly authorized [governmental] policy." ' Ortez v. Washington Cty., State of Or., 88 F.3d 804, 811 (9th Cir.1996) (citation omitted) (alteration in original); Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[L]ocal governments, like any other § 1983 'person,' ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 690-91.
 
 
 27
 In this case, the evidence was undisputed that County deputies had seized and never returned 64 items from Abe's Shop on 35 separate occasions over fifteen months, with no notice, court order, hearing, or reimbursement. In granting summary judgment, the district court also stated that there was undisputed evidence that "the procedure followed at Abe's is consistent with the practice of the sheriff's office."
 
 
 28
 The County does not dispute that it was customary for its officers to seize property from secondhand store owners and dispose of it without notice or hearing. Instead, it insists that Weaver had to show that the County Commissioners or the Sheriff knew of the procedure and explicitly approved it. But that is not required. "[T]he Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law." ' City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Weaver did not need to prove that the County's highest decision-makers knew of and expressly approved the practice. See Pembauer v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ("municipalities often spread policymaking authority among various officers .... particular officers may have authority to establish binding county policy respecting particular matters"); see also Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, ----, 117 S.Ct. 1382, 1389, 137 L.Ed.2d 626 (1997).
 
 
 29
 In the district court, the County did not argue in support of its motion for summary judgment that it was not liable under Monell. In granting summary judgment, the district court did not explicitly discuss Monell liability, instead simply finding that the method of confiscating the property from Abe's Shop and disposing of it to claimants was the common practice of the Sheriff's office. The County did not dispute that it was the Sheriff's practice. Further, the County's own witnesses confirmed that Sergeant Boehmer, the officer in charge of the Sheriff's Property Crimes Unit, reviewed with County counsel the practice of seizing and returning property without reimbursement, and authorized the deputies to continue the practice after assurance that the procedure was correct under the ordinance. Even on appeal, the County does not cite to any evidence that would support its assertion that the method of taking and returning secondhand property was not County policy.
 
 
 30
 The County also argues that the court should have instructed the jury on Monell so that the jury could determine whether the procedure used at Abe's Shop was County policy. We reject this argument. Although the County raised the issue of a Monell instruction in the district court, it did not submit a proposed instruction. The County was not entitled to a Monell instruction because the district court had already found as a matter of law that the procedure followed by the officers at Abe's Shop was County policy, and the County did not present evidence to the contrary. See Fikes v. Cleghorn, 47 F.3d 1011, 1014 (9th Cir.1995) (plaintiff not entitled to instruction when he has not presented evidence to support claim).
 
 
 31
 We affirm the grant of summary judgment holding that the method of taking secondhand property was a County policy.
 
 B. Damages
 
 32
 The County asserts that Weaver failed to prove that the failure to return the secondhand property taken from Abe's Shop caused him any actual damage, because he failed to establish that he had an interest in the property superior to the interest of those claiming ownership. Nevertheless, Weaver had a possessory interest in the property that he had purchased for Abe's Shop. G & G Jewelry, Inc., v. City of Oakland, 989 F.2d 1093, 1098 (9th Cir.1993) (pawnbroker has legitimate possessory interest in property as against all but person holding title). His possessory interest entitled him to due process. Id.; Sanders v. City of San Diego, 93 F.3d 1423, 1426-27 (9th Cir.1996). The County's failure to return the property deprived him of his interest without the notice or hearing due process required, and he was damaged by the failure to provide such a hearing regardless of whether he would have prevailed against the claimant. "[T]he procedural protections of the Fourteenth Amendment apply to protect a significant property interest, regardless of the ultimate outcome of a hearing on the final entitlement to the possession and ownership of the property." G & G Jewelry, 989 F.2d at 1098 (citing Fuentes v. Shevin, 407 U.S. 67, 87, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)).
 
 
 33
 Weaver paid money to purchase his possessory interest in the property. The County deprived him of the property without notice or a hearing. He was thus damaged at least in the amount he had paid to acquire his possessory interest (the measure used by the district court to amend the amount of his damages on the due process claim) when the County deprived him of that interest without due process.[1]
 
 
 34
 We affirm the award of damages for the due process violation.
 
 II. QUALIFIED IMMUNITY
 
 35
 The district court held on summary judgment that the searching officers did not have lawful access to the ADR log, so that the plain view exception did not justify its seizure without a warrant. The jury found that Deputy Hutchinson and the County did not violate Weaver's Fourth Amendment rights, but awarded Weaver $35,000 in damages against Lieutenant Nelson for "inspecting and removing the [ADR] from its location within Abe's Shop."
 
 
 36
 The district judge denied Lieutenant Nelson's motion for qualified immunity after trial. See Act Up!/Portland v. Bagley, 988 F.2d 868, 873-74 (9th Cir.1993) (if genuine issue of material facts exists as to qualified immunity, court should postpone determination whether immunity exists until facts have been developed at trial). On appeal, Lieutenant Nelson argues that the district court should have granted him qualified immunity. This court reviews the determination of qualified immunity de novo. Newell v. Sauser, 79 F.3d 115, 117 (9th Cir.1996).
 
 
 37
 To hold a public official liable in damages for violating an individual's constitutional rights, " 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." ' Reynolds v. County of San Diego, 84 F.3d 1162, 1166-67 (9th Cir.1996) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). A three-part inquiry determines whether the defense of qualified immunity is available:
 
 
 38
 First, we identify the right which was allegedly violated. Second, we determine whether the law governing the official's conduct is clearly enough established to alert a reasonable officer to its constitutional parameters. Third, we consider whether, under that law, a reasonable officer could have believed that his conduct was lawful.
 
 
 39
 Reynolds, 84 F.3d at 1167.
 
 A. Plain view doctrine
 
 40
 Weaver alleged that Lieutenant Nelson violated his right to be free from warrantless searches not supported by probable cause when he removed and copied the ADR. Lieutenant Nelson argued that in light of the law in effect at the time of the search, he reasonably believed that his conduct was lawful under the plain view doctrine.
 
 
 41
 The plain view doctrine allows the warrantless seizure of property in plain view when the officer is lawfully on the premises, the incriminating character of the evidence is "immediately apparent," and the officer "has a lawful right of access to the object itself." Horton v. California, 496 U.S. 128, 136-42, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); Roe v. Sherry, 91 F.3d 1270, 1272 (9th Cir.1996). The search or seizure of an object in plain view is valid only if the officer had probable cause to believe that the object was evidence of a crime. Arizona v. Hicks, 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). The general outlines of this doctrine were clearly established at the time of the search of Abe's Shop in November 1990. See id. (doctrine is well established).
 
 
 42
 There is no dispute that the ADR log was in plain view. The log, which was kept behind the counter, was placed onto the counter by Ladum, the store manager, who used it to assist the officers in locating weapons. As the compliance check progressed, Ladum turned the ADR log around so that the officers could themselves refer to the log.
 
 
 43
 It is also undisputed that the officers were lawfully on the premises of Abe's Shop. The county ordinance authorized them to enter the premises during business hours to perform a compliance check to inspect regulated property. Mult. County Code § 6.81.110. The ADR log was placed on the counter and turned around for their inspection by the store manager. While executing the compliance check, "the officers were where they had a legal right to be, looking where they had a legal right to look." Roe, 91 F.3d at 1272.
 
 
 44
 The incriminating nature of the ADR log was also immediately apparent to the officers, including Lieutenant Nelson. He testified that the records at Abe's Shop were "a real mess," and that the ADR helped the store manager, and later the officers, make sense of the purchase report forms and locate the weapons corresponding to the forms. It was therefore reasonable for Lieutenant Nelson to believe that the ADR log, which contained records of the firearms bought and sold by Abe's Shop, listed weapons for which the county reporting forms had not been completed. The ADR log thus was a piece of evidence indicating that Weaver had violated the county ordinance. See Roe, 91 F.3d at 1272-73 (two-page report clearly labeled "HIV" properly seized under plain view doctrine, where officers could reasonably believe report was evidence relevant to whether defendant violated military order not to engage in unprotected sex and to inform potential partners of HIV status).
 
 
 45
 The only remaining issue is whether, in the light of clearly established law, Lieutenant Nelson could reasonably have believed that he had a lawful right of access to the ADR log. The district court determined on summary judgment that the officers did not have lawful access to the log, because "only the Secretary of the Treasury is authorized to inspect an ADR, and then only after obtaining a warrant." We need not determine whether the district court erred in that conclusion, but instead only whether it was clearly established at the time of Lieutenant Nelson's conduct in 1990 that he did not have lawful access to federal firearms records.
 
 B. Federal firearms records
 
 46
 The ADR log is a federal record required by regulations enacted pursuant to 18 U.S.C. § 923(g), part of the Gun Control Act of 1968 ("GCA"), 18 U.S.C. §§ 921-30. Congress enacted the GCA out of "concern[ ] with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest." Huddleston v. United States, 415 U.S. 814, 824, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974). To keep firearms "out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency," id. (internal quotation omitted), the statute restricted access to firearms and required dealers to obtain federal licenses. Id.
 
 
 47
 Before 1986, the GCA also required licensed dealers to keep on file detailed records of the sale or disposition of firearms, and authorized the BATF to conduct warrantless inspections of those records during business hours. 18 U.S.C. § 923(g) (1984). Upon the request of a state agency, the GCA provided that the BATF could "make available to such State or any political subdivision thereof, any information ... with respect to the identification of persons ... who have purchased or received firearms or ammunition." Id.
 
 
 48
 Congress amended the GCA in 1986 with the Firearms Owners' Protection Act ("FOPA"). FOPA limited the BATF's inspection powers, requiring a warrant and a showing of "reasonable cause to believe a violation of this chapter has occurred and that evidence thereof may be found on such premises" before the BATF could inspect a firearm dealer's records. 18 U.S.C. § 923(g)(1)(A). The amended statute allows inspections without a warrant or reasonable cause for (1) a reasonable inquiry in the course of a criminal investigation of a person other than the licensed dealer, (2) an annual inspection to ensure compliance with record-keeping requirements, or (3) tracing a firearm in the course of a criminal investigation. Id. at § 923(g)(1)(B). FOPA authorizes the BATF to
 
 
 49
 make available to any Federal, State, or local law enforcement agency any information which he may obtain by reason of this chapter with respect to the identification of persons prohibited from purchasing or receiving firearms or ammunition who have purchased or received firearms or ammunition ... and he may provide information to the extent such information may be contained in the records required to be maintained by this chapter, when so requested by any Federal, State, or local law enforcement agency.
 
 
 50
 Id. at § 932(g)(1)(D).
 
 
 51
 Thus, subject to a number of exceptions, FOPA by its terms limits the access of federal agents to the firearms records by requiring reasonable cause and a warrant. The statute also explicitly provides for information-sharing with state and local agencies, either at the BATF's initiative or upon request. The statute does not clearly establish, however, whether federal firearms records, including the ADR log, are off-limits to state or local law enforcement officers when they are lawfully on the premises for a search or, as in this case, a compliance check authorized by a local ordinance.
 
 
 52
 Case law interpreting the GCA and FOPA does not clarify whether Lieutenant Nelson had lawful access to the ADR log. In United States v. Scherer, 523 F.2d 371 (7th Cir.1975), the Seventh Circuit held that it did not violate the Fourth Amendment to seize an ADR log as evidence in a federal criminal prosecution. A dealer licensed under the GCA had failed to record numerous weapons in his books, and seizure of the records as well as the guns was "the only feasible method" to allow a cross-check of the weapons with the records. Id. at 576. While this case addresses the evidentiary value of the log, it provides no insight into its accessibility by persons other than federal law enforcement officers.[2]
 
 
 53
 It was not clearly established in 1990 whether a federal firearms record could be inspected by local law enforcement officers in the course of a regulatory compliance check. It was also unsettled whether the ADR log, even if it could be inspected, could be seized (in this case, removed from the premises for photocopying). Because it was not clearly established in 1990 whether local law enforcement officers had lawful access to the ADR log, a reasonable officer could have believed that it was lawful to view and to copy it. Lieutenant Nelson was entitled to qualified immunity.
 
 
 54
 Because we conclude that the only remaining individual defendant in Weaver's claim for damages is immune, we need not address whether the search and seizure of the ADR log violated the Fourth Amendment.
 
 C. Consent
 
 55
 The County also argues that Weaver consented to the search and so consented to the seizure of the ADR log. In the district court, the County and Weaver disputed whether the seizure of the ADR log occurred before or after Weaver signed the consent form. The state supreme court held that it was bound by the state trial court's express finding that the ADR log was seized before Weaver signed the form. State v. Weaver, 319 Or. 212, 874 P.2d 1322, 1324 n. 4 (Or.1994). We need not address this issue, because our holding that the only remaining defendant on the Fourth Amendment issue is entitled to qualified immunity makes it unnecessary to determine whether the seizure was consensual.
 
 III. Unlawful imprisonment
 
 56
 Weaver claimed that the county violated his constitutional right against false imprisonment by detaining him for eight hours, and that the violation occurred because of a county policy of inadequately monitoring recalled warrants. The jury found that the County violated Weaver's constitutional rights under the Fourth and Fourteenth Amendments by depriving him of his liberty with deliberate indifference, and awarded him $1 in damages. The County argues that the judge should have granted its motion for a directed verdict on Weaver's claim of unlawful imprisonment.
 
 
 57
 This court reviews the denial of a motion for a directed verdict de novo. Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir.1994). A directed verdict is proper when, viewing the evidence in the light most favorable to the nonmoving party, the evidence permits only one reasonable conclusion. Id. "This court may not weigh the evidence or substitute its judgment for that of the jury, but rather must determine whether the verdict is supported by substantial evidence." Oviatt v. Pearce, 954 F.2d 1470, 1473 (9th Cir.1992) (internal quotation omitted).
 
 
 58
 "[T]he paradigmatic liberty interest under the due process clause is freedom from incarceration." Id. at 1474. Every deprivation of liberty, however, does not give rise to a constitutional claim. In Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), police arrested McCollan pursuant to a facially valid warrant and detained him for three days. After McCollan complained repeatedly, the police released him upon discovering that although the warrant bore McCollan's name he was not the wanted man. Id. at 144. McCollan sued the police under 42 U.S.C. § 1983, alleging that his three-day detention violated his Fourteenth Amendment protection against deprivation of liberty without due process. Id. at 142. Although the Supreme Court acknowledged that someone in McCollan's position could not be detained indefinitely, the Court concluded that the detention did not violate due process because the warrant was facially valid and three days was not unduly long. Id. at 144-45.
 
 
 59
 This circuit followed Baker in Erdman v. Cochise County, 926 F.2d 877 (9th Cir.1991). Erdman was arrested on a warrant that was facially valid but based on charges that already had been adjudicated. He was held for nine days in city jail and three more days in county jail before the error was acknowledged and he was released. Erdman filed a suit under § 1983. The city settled, and the district court granted summary judgment to the county. This court affirmed the grant of summary judgment, holding that the arrest was not a constitutional violation under Baker because the warrant was facially valid. Id. at 882. Further, Erdman presented no evidence that the County habitually made mistakes resulting in dual arrests for the same crime, or that the error in holding Erdman was intentional. Id. Even if his arrest and detention were constitutional violations, there was therefore no municipal policy justifying § 1983 liability. Id.
 
 
 60
 In this case, Weaver was detained under a facially valid warrant. Under Baker and Erdman, his arrest and eight-hour incarceration were not constitutional violations. Baker, 443 U.S. at 145 (detention over three-day weekend not unreasonable); compare Coleman v. Frantz, 754 F.2d 719, 723 (7th Cir.1985) (eighteen-day detention under facially valid warrant without appearance before magistrate "wholly inconsistent with concept of 'ordered liberty" ').
 
 
 61
 Further, even if a constitutional violation had occurred, Weaver has not demonstrated that "his deprivation resulted from an official policy or custom established by a municipal policymaker possessed with final authority to establish that policy." Erdman, 926 F.2d at 882. It was the state court's failure to forward information, rather than the County's policy, that resulted in the mistaken detention. See Mitchell v. Aluisi, 872 F.2d 577, 579 (4th Cir.1989) (where judge's secretary failed to notify sheriff of order recalling bench warrant, plaintiff did not show "that the ... sheriff's office, as opposed to state judges, w[as] responsible for formulating policy on recalled warrants").
 
 
 62
 Weaver argues that the County knew notification from the state court was spotty, and that the unconstitutional policy was the County's inadequate efforts to correct the problem. The County, however, had bought the state court a fax machine, which had lessened (although not eliminated) the problem. The state employees' failure to use the machine was not the County's responsibility. As the Fourth Circuit stated in Aluisi,
 
 
 63
 [W]e cannot deduce a municipal policy from bare allegations that state procedures were inadequate to prevent the service of recalled warrants. Plaintiff has suggested various improvements to the County's process .... The absence of such procedures hardly denotes an unconstitutional county policy, however.
 
 
 64
 872 F.2d at 580.
 
 
 65
 Weaver relies heavily on Oviatt, but his reliance is misplaced. In Oviatt, the plaintiff, a schizophrenic, was detained for 114 days without an arraignment because the County's system for keeping track of inmates was inadequate. The state court failed to docket the plaintiff for an appearance, and the County had no internal procedures to keep track of whether inmates had received an arraignment. The sheriff was aware of the problem, but chose to do nothing because he believed it was more trouble than it was worth to try to alleviate it. 954 F.2d at 1473. We concluded that the County's processes were inadequate, and that it was county policy not to remedy the failed system. Id. at 1477.
 
 
 66
 In this case, it is the state whose procedures failed. When the County learned of the problem, it attempted to address it by the provision of better communication links. The only reasonable conclusion from the evidence is that Weaver's brief detention did not violate a constitutional right or result from a county policy. We conclude that the jury's verdict was not supported by substantial evidence, and hold that the district court should have granted the County's motion for a directed verdict on Weaver's claim for unlawful imprisonment.
 
 VI. Attorney fees
 
 67
 The County argues that the district court erred in awarding Weaver attorney fees of $75,731.25 under 42 U.S.C. § 1988. Attorney fee awards are reviewed for an abuse of discretion. Id. at 1481.
 
 
 68
 Section 1988 authorizes the district courts to award a reasonable attorney's fee to prevailing parties in civil rights litigation. 42 U.S.C. § 1988. The purpose of § 1988 is to ensure effective access to the judicial process for persons with civil rights grievances. Congress has elected to encourage meritorious civil rights claims because of the benefits of such litigation for the named plaintiff and for society at large.
 
 
 69
 Id. at 1481-82 (internal quotations and citations omitted).
 
 
 70
 At the hearing on attorney fees, the district court considered the parties' pleadings and exhibits, and stated
 
 
 71
 I'm making a decision that [Weaver] prevailed really on three out of eight claims. I know there were claims before that were tossed, but when we get down to--I think we had eight claims, basically, before the jury. And you prevailed on three of those, including the one for the $1 with the imprisonment issue in the jail. And although there's some question whether anything has been changed by that, I would hope that somebody does something.
 
 
 72
 The court subsequently reduced the fee award by 25 percent for the five claims on which Weaver did not prevail.
 
 
 73
 Because we reverse the denial of qualified immunity and hold that the district court should have granted the motion for a directed verdict on the claim for unlawful imprisonment, Weaver actually prevailed on only one of his eight claims. We therefore reverse the award of attorney fees and remand to the district court for a redetermination of the amount of fees due Weaver. Weaver also requests attorney fees on appeal. Because he has been only partially successful, we award him attorney fees on appeal only for the due process claim he successfully defended on the merits. See Corder v.. Brown, 25 F.3d 833, 840-41 (9th Cir.1994). On remand, the district court should determine the appropriate amount of fees for this appeal.
 
 CONCLUSION
 
 74
 We affirm in part and reverse in part, and remand for a redetermination of attorney fees at trial and on appeal.
 
 
 75
 Each party to bear its own costs.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Weaver does not cross-appeal the amount of damages
 
 
 [2]
 The Fifth Circuit addressed a situation closer to the facts in this case five years after Lieutenant Nelson's 1990 seizure of the ADR log in United States v. Marchant, 55 F.3d 509 (5th Cir.), cert. denied, 516 U.S. 901, 116 S.Ct. 260, 133 L.Ed.2d 184 (1995). Marchant involved federal reporting forms, not the ADR log, and was decided long after Lieutenant Nelson's conduct. It is therefore of no assistance in determining whether the law concerning seizure of ADR logs was clearly established in 1990